UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

```
TROY ALLEN BIRKES,                    )
                                      )
              Plaintiff,              )    03:10-cv-00032-HU
                                      )
      vs.                             )    FINDINGS AND
                                      )    RECOMMENDATION
DON MILLS, et. al.,                   )
                                      )
                                      )
              Defendants.             )
          _____
```

Troy Allen Birkes
69246-065
Federal Correctional Institution
Inmate Mail/ Parcels
P.O. Box 5000
Sheridan, OR 9378

        Plaintiff *Pro Se*


John R. Kroger
Attorney General
Jacqueline Kamins
Samuel A. Kubernick
Assistant Attorneys General
Department of Justice
1162 Court Street NE
Salem, OR 97301-4096

        Attorneys for Defendants



FINDINGS AND RECOMMENDATION       1

HUBEL, Magistrate Judge:

## Introduction

Plaintiff Troy Allen Birkes ("Birkes"), an inmate in the custody of the Oregon Department of Corrections ("ODOC"), brings this suit under 42 U.S.C. § 1983 ("§ 1983") against ODOC employees[1] (collectively Defendants") for not permitting him to possess a publication entitled *The White Man's Bible*.  Birkes claims that Defendants have violated his rights to free speech and free exercise of religion under the First Amendment, equal protection and due process under the Fourteenth Amendment, and free expression under Article I, Section 8, of the Oregon Constitution.

Currently before the court is Defendants' motion (doc. #37) for summary judgment pursuant to Federal Rule of Civil Procedure ("Rule") 56(c).  Defendants' move the court for an order granting summary judgment on the grounds that (1) no constitutional violation has occurred in this case and, alternatively, (2) Defendants' are qualifiedly immune from damages for any alleged constitutional violation.  For the reasons set forth below, Defendants' motions should be GRANTED.

## Background

At all times relevant to Birkes's complaint, he was housed at Eastern Oregon Correctional Institution ("EOCI"), an ODOC facility in Pendleton, Oregon.  (CSMF ¶ 2.)  Birkes practices "Creativity,"

---

[1]The only individual defendants remaining in this suit are Don Mills, P. Maine, T. O'Malley, T. Sweet, R. Greer, Sharon Blackletter, and R. Coursey.  (Civil Rights Complaint Amended ("FAC") (doc. #9) ¶¶ 4-10.)  With the exception of Mills, who retired on June 1, 2010, Defendants are all current ODOC employees.  (Concise Statement Material Facts ("CSMF") (doc. #38) ¶3.)

1  which advocates racial purity and was founded by Daniel Klassen.
2  (CSMF ¶¶ 4,5.)  The central belief or creed of Creativity is "the
3  Golden Rule" that, "[w]hat is good for the White Race is the
4  highest virtue; what is bad for the White Race is the ultimate
5  sin."  (CSMF ¶ 5.)  *The White Man's Bible* is one of Daniel
6  Klassen's publications, which makes up part of the "official faith
7  and creed of Creativity."  (CSMF ¶ 6.)  ODOC included *The White*
8  *Man's Bible* on its list of rejected or unauthorized publications in
9  May 2002 because it contained "STG [security threat group] related
10 paraphernalia and inflammatory material."  (CSMF ¶ 7.)

11 In March of 2008, Birkes received notice of a "mail
12 violation," informing him that EOCI's mailroom staff would not
13 allow him to receive the copy of *The White Man's Bible* he had
14 ordered.  (CSMF ¶ 8; Decl. Randy Greer (doc. #40) ¶ 9; Mem. Supp.
15 Mot. Summ. J. (doc #39) at 7.)  In response, Birkes sent an "inmate
16 communication form" inquiring about the rejection and, in April
17 2008, was informed that, "[t]he book was denied due to being a used
18 book, but even it was new it was denied due to [security threat
19 group] content."  (CSMF ¶ 9.)  Birkes then filed a grievance
20 regarding the rejection of *The White Man's Bible*, but the rejection
21 was upheld.  (CSMF ¶ 10.)

22 Birkes pursued the grievance response through both levels of
23 appeal claiming, amongst other things, that Defendants' rejection
24 of the book infringed upon his practice of Creativity.  (CSMF ¶
25 11.)  The original decision to reject *The White Man's Bible* was
26 upheld throughout the grievance appeals process based, in part, on
27 the book being on ODOC's list of rejected publications.  (CSMF ¶
28 12.)  According to Defendants, *The White Man's Bible* contains

FINDINGS AND RECOMMENDATION    3

numerous instances of racially inflammatory language and advocates violence against other races and religions in order to advance the white race. (CSMF ¶ 13.) Viewing the content of *The White Man's Bible* as violent and racially charged, Defendants claim its presence in an ODOC facility would pose a threat to the safety and security of ODOC staff and Birkes's fellow inmates. (CSMF ¶ 14.)

### Legal Standard

Summary judgment is appropriate "if pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). Summary judgment is not proper if factual issues exist for trial. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id.* at 324. A nonmoving party cannot defeat summary judgment by relying on the allegations in the complaint, or with unsupported conjecture or conclusory statements. *Hernandez v. Spacelabs Medical, Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003). Thus, summary judgment should be entered against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

FINDINGS AND RECOMMENDATION    4

1    The court must view the evidence in the light most favorable
2    to the nonmoving party. *Bell v. Cameron Meadows Land Co.*, 669 F.2d
3    1278, 1284 (9th Cir. 1982). All reasonable doubt as to the
4    existence of a genuine issue of fact should be resolved against the
5    moving party. *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir. 1976).
6    Where different ultimate inferences may be drawn, summary judgment
7    is inappropriate. *Sankovich v. Life Ins. Co. of N. Am.*, 638 F.2d
8    136, 140 (9th Cir. 1981).

9        However, deference to the nonmoving party has limits. The
10   nonmoving party must set forth "specific facts showing a genuine
11   issue for trial." FED. R. CIV. P. 56(e). The "mere existence of
12   a scintilla of evidence in support of plaintiff's positions [is]
13   insufficient." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252
14   (1986). Therefore, where "the record taken as a whole could not
15   lead a rational trier of fact to find for the nonmoving party,
16   there is no genuine issue for trial." *Matsushita Elec. Indus. Co.,*
17   *Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal
18   quotation marks omitted).

**Discussion**

20   **I.    First Amendment Claims**

21       The Ninth Circuit has made clear that, "[t]he right to
22   exercise religious practices and beliefs does not terminate at the
23   prison door. The free exercise right, however, is necessarily
24   limited by the fact of incarceration, and may be curtailed in order
25   to achieve legitimate correctional goals or to maintain prison
26   security." *McElyea v. Babbitt*, 833 F.2d 196 (9th Cir. 1987)
27   (internal citations omitted). To merit protection under the free
28   exercise clause of the First Amendment, a religious claim must pass

FINDINGS AND RECOMMENDATION      5

1  muster under the "sincerity test," that is, (1) the proffered
2  belief must be sincerely held and (2) the claim must be rooted in
3  religious belief rather than secular philosophical concerns. *Malik*
4  *v. Brown*, 16 F.3d 330, 333 (9th Cir. 1994).

5      **A.    Is Creativity a Religion?**

6      Defendants do not dispute that Birkes's beliefs are sincerely
7  held,[2] the court therefore turns to their argument that Creativity
8  does not qualify as a religion for the purposes of the First
9  Amendment. *See Conner v. Tilton*, No. C 07-4965 MMC, 2009 WL
10  4642392, at *6 (N.D. Cal. Dec. 2, 2009); *see also Prentice v.*
11  *Nevada Dep't of Corrections*, No. 09-cv-0627, 2010 WL 4181456, at *3
12  (D. Nev. Oct. 19, 2010). One district court has found Creativity
13  qualifies as a religion in the context of an employment
14  discrimination claim brought under Title VII of the Civil Rights
15  Act, which is a much broader standard than that employed in the
16  context of the First Amendment. *Conner*, 2009 WL 4642392, at *6
17  n.4.    However, "[s]everal courts have held that . . .
18  Creativity . . . did not constitute a religion for purposes of the
19  First Amendment, but was instead a vehicle for white segregation."
20  *Fricks v. Upton*, No. 5:10-CV-458, 2011 WL 3156680, at*6 (M.D. Ga.
21  Apr. 14, 2011) (collecting cases).  I recommend adopting the well
22  reasoned analysis of those decisions.

23      In *Conner* and *Prentice*, the courts applied the criteria
24  identified in *Africa v. Pennsylvania*, 662 F.2d 1025 (3d Cir. 1981),
25  and adopted by the Ninth Circuit in *Alvarado v. City of San Jose*,
26  94 F.3d 1223, 1229-30 (9th Cir. 1996). *Prentice*, 2010 WL 4181456,

27  _____

28      [2] (Mem. Supp. Mot. Summ. J. (doc. #39) at 13 n.5.)

FINDINGS AND RECOMMENDATION      6

at *3-4; *Conner*, 2009 WL 4642392, at *7-12. *Africa*'s test focuses on three criteria to assist courts in determining whether a set of beliefs is religious:

> First, a religion addresses fundamental and ultimate questions having to do with deep and imponderable matters. Second, a religion is comprehensive in nature; it consists of a belief-system as opposed to an isolated teaching. Third, a religion often can be recognized by the presence of certain formal and external signs.

*Africa*, 662 F.2d at 1032.

In *Conner*, the court determined that Creativity did not meet the first prong of the *Africa* test because "Creativity's guiding principles . . . reflect no more than a pragmatic philosophy that Creators must act to ensure the survival and promote the dominance of [the White Race]." *Conner*, 2009 WL 4642392, at *11. *Conner* also determined that Creativity failed under the third prong of the *Africa* test even though Creativity has formal and external characteristics similar to more traditional religions, since its sole purpose is to support a secular belief system. *Id.* at *13. Ultimately, the court determined that there was no genuine issue as to whether Creativity was a religion. *Id.* at *14.

Similarly, in *Prentice*, the court found that Creativity was not a religion for purposes of the First Amendment. *Prentice*, 2010 WL 4181456, at *4. The *Prentice* court's decision was based, in part, on the fact that, "Creativity is confined to 'one question or one moral teaching' which, again, can be summed up by Creativity's Golden Rule: 'What is good for the White Race is the highest virtue; what is bad for the White Race is the ultimate sin.'" *Id.* at *3. *Prentice* concluded that, while Creativity governed the

FINDINGS AND RECOMMENDATION    7

1    plaintiff's behavior in wide-ranging respects, is not sufficiently
2    comprehensive to meet the second *Africa* criterion. *Id.* at *4.

3    Here, the court is not persuaded that Creativity is rooted in
4    religious belief rather than secular philosophical concern and
5    Birkes has presented no evidence or argument that warrants
6    deviating from the *Prentice* and *Conner* holdings.

7    "[T]he First Amendment does not extend to 'so-called religions
8    which . . . are obviously shams and absurdities and whose members
9    are patently devoid of religious sincerity.'"  *Malik*, 16 F.3d at
10    333 (citing *Callahan v. Woods*, 658 F.2d 679, 683 (9th Cir. 1981)).
11    The secular philosophical concern underlying Creativity is evinced
12    by the fact that Creators celebrate "Matt Hale Day" and "Benjamin
13    Smith Memorial Day." (Br. Opp'n Defs.' Mot. Summ. J. (doc. #48) at
14    20.)  Matthew Hale was the former leader, or "Pontifex Maximus" of
15    Creativity, who was convicted of plotting to have a United States
16    District Judge murdered. *United States v. Hale*, 448 F.3d 971, 974
17    (7th Cir. 2006).  Benjamin Smith, on the other hand, went on a
18    shooting spree in July 1999, that left two persons dead and nine
19    others wounded. *Id.* at 975.  "Days after Hale had publicly
20    announced he was denied an Illinois law license, Smith traveled
21    throughout Illinois and Indiana targeting black, Asian, and Jewish
22    victims before committing suicide." *Id.*  Hale gave a eulogy at
23    Smith's memorial service, praising Smith's willingness to take
24    action and spread Creativity's "sacred message." *Id.*

25    Systems of belief that propound ideals of racial segregation
26    or supremacy may be entitled to First Amendment protection when
27    they are sufficiently intertwined with, or stem from, religious
28    beliefs. *Conner*, 2009 WL 4642392, at *11 (citing *Wiggins v.*

FINDINGS AND RECOMMENDATION    8

*Sargent*, 753 F.2d 663, 667 (8th Cir. 1985).   Creativity is not predicated on such religious beliefs, however.   "[T]he end that Creativity seeks is a society that has been restructured through white segregation, the attainment of which is not intertwined in any way with the contemplation of 'deep and imponderable' matters analogous to those with which traditional religions are concerned." *Id.* at *12.   The court therefore agrees with *Conner* and *Prentice* that Creativity fails to qualify as a religion under the *Africa* test.

### B.   Legitimate Penological Interests

Even assuming, *arguendo*, Creativity qualified as a religion, Defendants' would still be entitled to summary judgment as to Birkes's First Amendment claims.   When, as here, it argued that a prison regulation infringes on an inmates' constitutional rights, "the regulation is valid if it is reasonably related to legitimate penological interests."   *Shakur v. Shriro*, 514 F.3d 878, 884 (9th Cir. 2008) (quoting *Turner v. Saffley*, 482 U.S. 78, 89 (1987)). *Turner* set forth four factors to considered in making this determination:

> (1) Whether there is a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it;
>
> (2) Whether there are alternative means of exercising the right that remain open to prison inmates;
>
> (3) Whether the accommodation of the asserted constitutional right will impact guards and other inmates, and on the allocation of prison resources generally; and
>
> (4) Whether there is an absence of ready alternative versus the existence of obvious, easy alternatives.

*Id.* (citation, internal alterations and quotation marks omitted).

FINDINGS AND RECOMMENDATION      9

1    Here, Birkes has brought the following First Amendment claims:
2    a freedom of religion claim, a free exercise claim, and freedom of
3    speech claim.   (FAC ¶¶ 52, 56-57.)   The *Turner* analysis is
4    applicable to all three claims. *See Gonzalez v. Mullen*, No. C 09-
5    00953 CW, 2010 WL 1957376, at *3-6 (N.D. Cal. May 14, 2010)
6    (analyzing the similar claims of a *pro se* prisoner under *Turner* and
7    the legitimate penological interests standard).

8    Initially, EOCI mailroom staff rejected Birkes' requested copy
9    of *The White Man's Bible* because it was used. (Decl. Randy Greer
10   (doc. #40) ¶ 9.)   Under Oregon Administrative Rules ("OAR") 291-
11   131-0025(5), absent prior authorization, inmates are only permitted
12   to received new books directly from the publisher. (*Id.*)   In
13   response to Birkes's inmate communication form, EOCI mailroom staff
14   informed Birkes that *The White Man's Bible* would have also been
15   rejected since it had previously been banned for containing
16   security threat group ("STG") content. (*Id.* ¶ 10.)   Pursuant to
17   OAR 291-131-0035, the following material constitutes prohibited
18   mail which must be confiscated, "[m]aterial which by its nature or
19   content poses a threat or is detrimental to the security, safety,
20   health, good order or discipline of the facility, inmate
21   rehabilitation, or facilitates criminal activity, including . . .
22   material that . . . contains inflammatory material[.]"   OAR 291-
23   131-0035(2)(j) (2008).   "Inflammatory material" is defined as
24   "[m]aterial whose presence in the facility is deemed by the
25   department to constitute a direct and immediate threat to the
26   security, safety, health, good order, or discipline of the facility
27   because it incites or advocates physical violence against others."
28   OAR 291-131-0010(9) (2008).

FINDINGS AND RECOMMENDATION    10

On November 2, 2010, ODOC's Chief of Inmate Services, Randy Greer ("Greer"), reviewed *The White Man's Bible* and confirmed that it contained language that is inflammatory material not authorized in a correctional facility. (Decl. Randy Greer ¶ 11.) For example, Greer notes that on page 250 of the *White Man's Bible*, "the author refers to groups of people as mongrelized, mud race, animals, and black poison. The author celebrates the use of the term 'nigger' and calls the White Race to action to excrete this waste from the White Racial Community." (*Id.* ¶ 13.) Greer ultimately determined that the contents of the book posed a threat to the security, safety, health, good order and discipline within ODOC facilities. (*Id.* ¶ 15.) Based on the dynamics amongst the prison populous, Greer claims any publication advocating an inmate to disparage, mistreat, or attack others based on racial or ethnic can have disastrous consequences in a prison environment. (*Id.*)

The court finds *Byrnes v. Biser*, No. 06-249J, 2007 WL 3120296 (W.D. Pa. Oct. 23, 2007), instructive on this matter. In *Byrnes*, a *pro se* prisoner brought a § 1983 complaint after prison officials had refused him access to a book entitled *Nature's Eternal Religion*[3] because it contained racially inflammatory material or material that could cause a threat to the inmates, staff or security of the facility. *Id.* at *1. In evaluating whether the

---

[3]  *The White Man's Bible* was published by Ben Klassen, who stated within the text that, "[t]his book together with *Nature's Eternal Religion* constitutes the official faith and creed of Creativity, the basic religion of the Church of the Creator." (Decl. Tim Cayton (doc. #41) ¶ 5.) It is therefore apparent that, although *Byrnes* dealt with a different text, the question and circumstances presented to the court are essentially one and the same.

prisoner's First Amendment rights had been infringed, the court assessed the reasonableness of the applicable prison regulation under *Turner*.  *Id.* at *2.  The regulation at issue, which is analogous to the regulation in this case, prohibited "racially inflammatory material or material that could cause a threat to the inmate, staff, and security of the facility[.]" *Id.*  *Byrnes* determined that the *Turner's* first prong was met because

> a text premised upon the principle that the purity of the white race must be maintained, and that 'mud races' must be eliminated, is-without any debate whatsoever- racially inflammatory.  That said, the Pennsylvania Department of Corrections has a valid, rational interest in refusing inmates access to *Nature's Eternal Religion*.

*Id.* at *3.  *Turner's* second prong weighed in favor of seizure since, as here, there was only one book at issue and there was no claim that a broad range of publications had been banned.  *Id.*  Likewise, *Turner's* third prong weighed in favor of seizure due, in part, to the fact that "[p]ermitting circulation of *Nature's Eternal Religion* in an institution housing diverse racial groups would adversely affect the prison as a whole." *Id.* at *4.

This case ultimately boils down to whether Birkes should be entitled to possess *The White Man's Bible* after balancing the factors delineated in *Turner*.  The answer is clearly no.

The second prong also weighs in favor of seizure because, as in *Byrnes*, there is only one book at issue and broad range of publications have not been banned.

Moreover, racial and ethnic minorities comprise a significant portion of EOCI's inmate population and many prison gangs include racial identity as an element of membership.  (Decl. Randy Greer ¶ 15.)  Permitting circulation of *The White Man's Bible* would clearly

FINDINGS AND RECOMMENDATION    12

1  adversely affect the prison thereby satisfying *Turner's* third
2  prong. *See also Prentice*, 2010 WL 4181456, at *4 (holding that,
3  "[a] policy to deny materials that are blatantly racist and that
4  advocate violence or aggression against others because of their
5  race is a policy related to a compelling interest in that safety
6  and security.")

7      Lastly, *Turner's* fourth prong requires the court to consider
8  whether "there are ready alternatives to the prison's current
9  policy that would accommodate [Birkes] at de minimis cost to the
10 prison." *Shakur*, 514 F.3d at 887 (quoting *Ward v. Walsh*, 1 F.3d
11 873, 879 (9th Cir. 1993)).    "The existence of obvious, easy
12 alternatives may be evidence that the regulation is not reasonable,
13 but is an exaggerated response to prison concerns." *Id.* (citation
14 and quotation marks omitted).    Birkes relies on the fact that
15 Defendants' themselves have stated that there are no readily
16 available alternatives. (Br. Opp'n Defs.' Mot. Summ. J. (doc. #48)
17 at 29.)    Birkes goes on to proclaim, without specifying any
18 specific alternatives himself, that Defendants never approached him
19 to see what alternatives may be available.    (*Id.*)   Here, the
20 regulation on its face is not an "exaggerated response" to the
21 problem at hand.   In addition, Birkes has not proffered, nor can
22 the court conceive any readily available alternatives to ODOC's
23 policy. *Turner's* fourth prong is therefore satisfied. *See Leyva
24 v. Kernan*, 2009 WL 1883770, at *4 (N.D. Cal. June 30, 2009)
25 (holding that *Turner's* fourth prong was met because the plaintiff
26 provided no alternative that accommodated his First Amendment right
27 at de minimis cost to valid penological interests).

28

FINDINGS AND RECOMMENDATION     13

1    In short, to quote *Byrnes*, "the balancing required under

2    *Turner* clearly supports a finding that the seizure of a single book

3    which includes racially inflammatory material did not violate

4    [Birkes]'s First Amendment rights." Accordingly, Defendants'

5    motion for summary judgment on Birkes's First Amendment claims

6    should be granted.

7    **II.** **Religious Land Use and Institutionalized Persons Act**

8    Birkes has devoted portions of his opposition to arguments

9    regarding the Religious Land Use and Institutionalized Persons Act

10   ("RLUIPA"). (Br. Opp'n Defs.' Mot. Summ. J. (doc. #48) at 12-13,

11   25.) RLUIPA and First Amendment claims are distinct and are

12   subject to differing standards. *See Greene v. Rourk*, No CIV S-04-

13   0917, 2009 WL 1759638, at *4-6 (E.D. Cal. June 22, 2009)**;** *see also*

14   *Tyson v. Guisto*, No. CV-06-1415-KI, 2010 WL 2246381, at *2-7 (D.

15   Or. June 4, 2010); *see also Malik v. Clarke*, 2008 WL 1752224, at *6

16   n.5 (W.D. Wash. Mar. 18, 2008) (stating that a challenge under the

17   Free Exercise Clause imposes a higher standard on plaintiffs and a

18   lower standard on defendants, as compared to RLUIPA), *adopted in*

19   *part by,* 2008 WL 1780935 (W.D. Wash. Apr. 15, 2008)**.** Birkes has

20   failed to specifically plead in his complaint a violation of the

21   RLUIPA. (FAC ¶¶ 51-57). However, there is a longstanding

22   principle that federal complaints plead claims, not causes of

23   action or statutes or legal theories. *Alvarez v. Hill*, 518 F.3d

24   1152, 1154 (9th Cir. 2008). Based on the allegations presented and

25   Birkes's subsequent filings[4], the court has a duty to analyze

26   _____

27   [4] *See id* at 1158 (noting that, as in this case, the *pro*
     *se* prisoner's opposition to summary judgment described at length
28   the RLUIPA standard and urged the court to apply it to the fact

FINDINGS AND RECOMMENDATION    14

1  Birkes's religious exercise claims under RLUIPA, "which establishes
2  a more protective standard than does the First Amendment." *Id.*

3      Nonetheless, RLUIPA is not a vehicle to protect "any way of
4  life, however virtuous and admirable, . . . if it based on purely
5  secular considerations." *Conner*, 2009 WL 4642392, at *14 (citation
6  omitted). Here, as discussed above, the court has found Birkes's
7  evidence insufficient to support a finding that his beliefs are
8  based on anything other than secular considerations. Since Birkes
9  has not met his burden with respect to the issue of whether
10 Creativity is a religion, Defendants are entitled to summary
11 judgment on an alleged RLUIPA violation. *See id.* at *15 (holding
12 the same).

13 **III. <u>Fourteenth Amendment Claims</u>**

14      **A.   <u>Equal Protection</u>**

15      Birkes contends that Defendants restrictions violate his
16 rights under the Equal Protection Clause of the Fourteenth
17 Amendment. Birkes claims that he is a member of an identifiable
18 class, *e.g.*, members of the religious group known as "The Church of
19 the Creator," or Creativity. (Br. Opp'n Defs.' Mot. Summ. J. (doc
20 #48) at 8.) The crux of Birkes's position is that "he was treated
21 differently from similarly situated inmates by contrasting
22 differences of religions[.]" (*Id.* at 9.) Notably, Birkes quotes
23 several verses taken from the Qur'an, which Birkes claims is "an
24 accepted and recognized religion within the ODOC." (*Id.* 9-10.)
25 Birkes seems to imply that the Qur'an is an approved publication
26 and recognized religion despite it being equally, if not more,

27

28 alleged in his complaint).

FINDINGS AND RECOMMENDATION      15

inflammatory than *The White Man's Bible*.  (*Id.* at 11.)  Birkes
therefore claims that Defendants are intentionally discriminating
against him and severely limiting his ability to practice
Creativity.  (*Id.*)

According to Defendants, to the extent that Birkes's
"contention may be that other religious groups have greater
resources and opportunities than he has, as the case law denotes,
the Fourteenth Amendment does not require that prison officials
provide such identical resources and opportunities to inmates of
varying religious sects[,]" citing *Cruz v. Beto*, 405 U.S. 319, 322
n.2 (1972).  Thus, Defendants claim that, "even if other religious
groups have greater resources, that does not establish a genuine
issue of material fact regarding any equal protection violation."
(Mem. Supp. Defs.' Mot. Summ. J. (doc. #39) at 13.)

In *Shakur*, Amin Rahman Shakur ("Shakur"), an inmate of the
Arizona Department of Corrections ("ADOC"), changed his religious
preference designation from Catholic to Muslim.  *Shakur*, 514 F.3d
at 881.  Due to his religious practices, Shakur requested dietary
accommodations similar to that provided to Jewish inmates.  *Id.* at
882.  ADOC denied Shakur's request and Shakur eventually filed a
*pro se* civil rights complaint claiming, amongst other things, an
Equal Protection violation based on ADOC's failure to afford him
the right it afforded Jewish inmates.  *Id.* at 882-83.  On appeal
before the Ninth Circuit, Shakur claimed that the district court
erred in granting summary judgment to ADOC on his claim that ADOC
violated the Fourteenth Amendment's Equal Protection Clause by
providing only Jewish inmates with a kosher meat diet.  *Id.* at 891.
The district court had applied rational basis review because it

FINDINGS AND RECOMMENDATION     16

determined that prison inmates were not a protected class for equal protection analysis purposes. *Id.* The Ninth Circuit concluded that:

> [T]he district court erred in focusing on Shakur's status as a prisoner rather than his status as a Muslim. The district court thus applied the wrong standard of review, substituting mere rational basis review for the four-part balancing test required by *Turner*. Under the *Turner* test, Shakur can not succeed if the difference between the defendants' treatment of him and their treatment of Jewish inmates is reasonably related to legitimate penological interests.

*Id.* (citing *DeHart v. Horn*, 227 F.3d 47, 61 (3d Cir. 2000)).

*Shakur* makes clear that the *Turner* balancing test applies to Birkes's equal protection claim alleging religious discrimination by the ODOC. *See Hundal v. Lackner*, No. EDVC 08-00543-CAS, 2011 WL 1935734, at * (C.D. Cal. Apr. 12, 2011) (noting that a prisoner's equal protection claim alleging religious discrimination is evaluated under *Turner*), *Report and Recommendation Adopted by,* 2011 WL 1979044 (C.D. Cal. May 20, 2011); *see also Rupe v. Cate*, 688 F. Supp. 2d 1035, 1049 (E.D. Cal. 2010) (citing *Shakur* for the proposition that the *Turner* test applies "to Equal Protection claims arising out of prison.") Here, as discussed above, the *Turner* test has been satisfied. Accordingly, Defendants are entitled to summary judgment on Birkes's Equal Protection claim.

**B. Due Process**

Next, Birkes claims that Defendants violated "a liberty as well as a property interest" by denying him the right to "religious materials/ publications, namely *The White Man's Bible*[.]" (Br. Opp'n Defs.' Mot. Summ. J. (doc. #48) at 6.) Birkes claims that his procedural due process rights were violated when Defendants failed to give him or the publisher of *The White Man's Bible* a

FINDINGS AND RECOMMENDATION     17

hearing on the violation of their policies. (*Id.* at 5.) Birkes further contends that Defendants were required to address his discrimination complaint within ninety days, but took over a year to respond in violation of OAR 291-006-0015. (*Id.*) Lastly, Birkes claims that Defendants violated his due process rights by not returning the ordered copy of *The White Man's Bible* to the publisher or providing them with notice of the mail violation in accordance with OAR 291-131-0050.[5] (*Id.* at 6; FAC ¶ 13, 15.)

In *Barrett v. Belleque*, No. CV-06-876, 2007 WL 2688227 (D. Or. Sept. 4, 2007), the *pro se* plaintiff, an inmate at the Two Rivers Correctional Institution, claimed that ODOC employees violated his due process rights by failing to conduct a timely mail review in accordance with the applicable OAR. *Id.* at *1. Specifically, the prisoner claimed his due process rights were violated since ODOC was required to conduct a mail review within 45 days under OAR 291-131-0050(B)(e). *Id.* at *7. *Barrett* appropriately stated that, "violations of state law or administrative rules do not, without more, provide a basis for a section 1983 claim." *Id.*

---

[5] Defendant Greer claims that, "[a] copy of the mail violation was sent to the publisher, *Creativity Publications*[.]" (Decl. Randy Greer ¶ 9.) Defendant Mills informed Birkes, "the legal documents you provided as evidence from the State of California, from Carol Schmidt, PO Box 1603, Porterville, CA 93258, is the same address that was used on the Mail Violation Notice for, Sender: Creativity Publications, PO Box 1603." (Decl. Supp. Pl.'s Compl. (doc. #20-1) at 32.) Any difficulty in returning the book to the publisher and/or delivering notice of a mail violation may be due to the fact that "[e]very attempt to locate this business, 'Creativity Publications' by phone has failed. All attempts to locate the publisher by internet are filtered by WEBSENSE for 'Racism and Hate.'" (*Id.* (doc. #20-3) at 3.)

1    Here, as in *Barrett*, the court is faced with alleged OAR

2    violations.   Specifically, Birkes claims Creativity Publications

3    did not receive notice of the mail violation and ODOC did not

4    process his discrimination complaint within ninety days.  However,

5    state procedural rules do not create due process rights.  *Olim v.*

6    *Wakinekona*, 461 U.S. 238, 250 (1983).  "[A] state's violation of

7    its own state procedural rules does not violate a federal

8    constitutional guarantee unless the state also failed to comply

9    with the procedural requirements arising under the federal

10   Constitution."  *Barrett*, 2007 WL 2688227, at *7 (citation omitted).

11   The court therefore finds Birkes's arguments on this ground

12   unavailing because OAR violations, without more, do not provide the

13   basis for a § 1983 claim.

14   Moreover, Defendants were not required to provide a hearing in

15   this case to Birkes or the publisher of *The White Man's Bible*.  It

16   is well settled that withholding delivery of inmate mail must be

17   accompanied by minimum procedural safeguards.  *Sorrels v. McKee*,

18   290 F.3d 965, 972 (9th Cir. 2002).   Constitutional due process

19   requires that an inmate whose mail is rejected receive notice of

20   the rejections and that any complaint be referred to a prison

21   official other than the person who originally disapproved the

22   correspondence.  *See Procunier v. Martinez*, 416 U.S. 396, 417-19

23   (1974), *overruled on other grounds by Thornburgh v. Abbott*, 490

24   U.S. 401, 413-14 (1989).   In other words, an inmate has a

25   constitutional right to two-level review of the decision to

26   withhold mail, *i.e.*, the initial review and an appeal to a prison

27   official other than the one who made the initial determination.

28   *Krug v. Lutz*, 329 F.3d 692, 697-98 (9th Cir. 2003).

FINDINGS AND RECOMMENDATION      19

1   In this case, it is undisputed that Birkes received notice of
2   a mail violation informing him that *The White Man's Bible* had been
3   rejected on March 24, 2008, by defendant Sweet. (CSMF ¶ 8; Decl.
4   Supp. Pl.'s Compl. (doc. #20-1) at 8.)   Sweet informed Birkes on
5   April 22, 2008, that *The White Man's Bible* was rejected since it
6   was used and it contained STG content. (*Id.* at 10.)   Birkes then
7   filed a grievance on that same day. (*Id.* at 13.)   Defendant
8   O'Malley responded to Birkes's grievance on May 1, 2008, affirming
9   the prior rejection. (*Id.* at 21.)   Birkes then filed a grievance
10  appeal form on May 7, 2008. (*Id.* at 23-24.)   Defendant Mills
11  denied Birkes's appeal on May 27, 2008. (*Id.* at 31-32.)   Thus, it
12  is apparent that Birkes was provided the minimal procedural
13  safeguards.   Accordingly, Defendants are entitled to summary
14  judgment on Birkes's Due Process claim.

15  **IV.   Article I, Section 8, of the Oregon Constitution**

16      Birkes next asserts that his rights under Article I, Section
17  8, of the Oregon Constitution were violated. (FAC ¶ 53.) Defendants
18  argue this claim potentially raises a novel or complex issue of
19  state law and since Birkes will not establish a violation of any of
20  his federal constitutional rights, the court should decline to
21  exercise supplemental jurisdiction over this claim. (Mem. Supp.
22  Defs.' Mot. Summ. J. (doc. #39) at 8.)

23      Under the federal supplemental jurisdiction statute, a court
24  may decline to exercise jurisdiction over a supplemental state law
25  claim if:

26      (1) the claim raises a novel or complex issue of State
        law;

27

28      (2) the claim substantially predominates over the claim
        or claims over which the court has original jurisdiction;

FINDINGS AND RECOMMENDATION     20

(3) the district court has dismissed all claims over which it has original jurisdiction; or

(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c). Here, both subsections (1) and (3) support declining jurisdiction. Specifically, there isn't any federal claim left which is a good reason not to exercise supplemental jurisdiction over Birkes's state constitutional claims which raise complex issues of state law. I therefore recommend that the court decline to exercise supplemental jurisdiction over this state constitutional claim.[6]

## V.    Injunctive and Declaratory Relief

Defendants contend that any request for injunctive or declaratory relief should be denied as moot since Birkes has been released from ODOC's custody. (Defs.' Reply (doc #58) at 2.)

"A prisoner's claim for injunctive or declaratory relief becomes moot when he or she leaves the prison." *Giusto*, 2010 WL 2246381, at *4 (citing *Johnson v. Moore*, 948 F.2d 517, 519 (9th Cir. 1991)). There is an exception when, for example, the action is capable of repetition yet evading review. *Id.*

Here, on April 15, 2011, after Defendants filed for summary judgment and after Birkes responded, he was transferred to the custody of the US Marshals for transport to a federal correctional institution. (Decl. Samuel Kubernick (doc. #59) ¶¶ 4-6.) Birkes is currently incarcerated at Federal Correctional Institution

---

[6] In any event, as Defendants correctly point out, no private right of action for damages exists for violations of Article I, section 8, of the Oregon Constitution. *Hunter v. Eugene*, 309 Or. 298, 304 (1990).

1  Sheridan, with an actual or projected release date of September 5,

2  2013. (*Id.* ¶ 6.) Nothing in the record indicates that Birkes is

3  likely to return to EOCI or any other ODOC facility. (*Id.* ¶ 7.)

4      In short, Defendants are correct that Birkes's claim for

5  injunctive and declaratory relief are moot.

6  **VI.** **Qualified Immunity**

7      Defendants argue that they are entitled to qualified immunity

8  regardless of whether Birkes's constitutional rights were violated

9  because there is no genuine issue of material fact as to whether it

10  would have been clear to each named defendant that it was unlawful

11  to prohibit Birkes from possessing *The White Man's Bible*. (Mem.

12  Supp. Defs.' Mot. Summ. J. (doc. #39) at 22.)

13      The court need not address the qualified immunity issues

14  because the court agrees with Defendants that they have not

15  violated Birkes constitutional rights. *See Ray v. Williams*, No.

16  CV-04-863-HU, 2005 WL 697041, at *4 (D. Or. Mar. 24, 2005)

17  (declining to address the qualified immunity issue since the court

18  agree that the defendants should prevail on the merits; *see also*

19  *Giusto*, 2010 WL 2246381, at *6 (declining to address a qualified

20  immunity defense since the defendant was determined not to be

21  individually liable under RLUIPA or § 1983).

22                          **Conclusion**

23      For the reasons stated above, Defendants' motion (doc #37) for

24  summary judgment should be GRANTED.

25                       **Scheduling Order**

26      The Findings and Recommendation will be referred to a district

27  judge. Objections, if any, are due October 17, 2011. If no

28  objections are filed, then the Findings and Recommendation will go

FINDINGS AND RECOMMENDATION     22

under advisement on that date.  If objections are filed, then a response is due November 3, 2011.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

Dated this __28th__ day of September, 2011.

/s/ Dennis J. Hubel

_____

Dennis James Hubel
United States Magistrate Judge

FINDINGS AND RECOMMENDATION      23